COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Chief Judge Huff, Judges Petty and McCullough
Argued at Richmond, Virginia


JOYCE ROSEMARY BRUCE

                                                      OPINION BY
v.        Record No. 1250-14-3              JUDGE STEPHEN R. McCULLOUGH
                                                      APRIL 21, 2015
ROBERT PRESTON BOARDWINE


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Charles N. Dorsey, Judge

Monica Taylor Monday (Kristen Konrad Johnstone; Gentry Locke
Rakes & Moore, LLP; Osterhoudt, Prillaman, Natt, Helscher, Yost,
Maxwell & Ferguson, P.L.C., on briefs), for appellant.

Thomas W. Roe, Jr. (Spigle, Roe, Massey & Clay, PLC, on brief),
for appellee.

James P. Cargill (James P. Cargill, P.C., on brief), Guardian *ad
litem* for the infant child.


Joyce Rosemary Bruce, the biological and birth mother of a child, J.E., asked the circuit

court to dismiss a petition for custody and visitation filed by the child's biological father, Robert

Preston Boardwine.  Bruce argues that Boardwine is nothing more than a sperm donor under

Virginia's assisted conception statute and that he has no right to custody or visitation.

Boardwine responds that the assisted conception statute does not apply and that he established

his paternity through DNA testing.  We agree with Boardwine and affirm the judgment below.

BACKGROUND

I. THE CHILD'S CONCEPTION

Bruce wanted to conceive a child she could raise on her own, without the involvement of

a father.  Bruce apparently believed that if she became pregnant in a way that did not involve

sexual intercourse, the biological father would not have a claim to any parental rights. To accomplish this goal, Bruce approached Boardwine, a longtime friend, and asked him to be a sperm donor. After some hesitation, Boardwine agreed. Although the parties discussed a written contract regarding any resulting pregnancy, none was ever signed.

Bruce explained the method she used to try to become pregnant. Boardwine would stop by Bruce's house. He would go to a separate room. Then, he would give her a plastic container containing his sperm. After a brief conversation, Boardwine would leave. Bruce used an ordinary turkey baster to inseminate herself. No other person was involved. They did not go to a doctor's office or to a medical facility.

When this procedure did not cause Bruce to become pregnant, she turned to a fertility doctor, Dr. Robert Slackman. Dr. Slackman ran some tests, suggested assistance from drugs, and attempted two inseminations with sperm from unknown donors. Neither attempt succeeded, and Bruce again turned to Boardwine.

In June 2010, Boardwine went to Bruce's home several times. On these occasions, Bruce did not urge him to sign a contract. She explained that she trusted him and, if it worked, they could "talk about it some more." Bruce and Boardwine employed the same insemination procedure they had used previously. On July 7, 2010, she discovered that she was pregnant.

Bruce and Boardwine have never engaged in sexual relations. They have never lived together, and they do not intend to live together.

## II. BRUCE AND BOARDWINE'S SUBSEQUENT RELATIONSHIP

Initially, Bruce and Boardwine remained on good terms. When Bruce informed Boardwine about the pregnancy, he visited and brought gifts, a stuffed bear and clothes for her and the baby.

Bruce testified that her expectation was that Boardwine would visit and "be involved as [her] other friends were involved." She never anticipated that Boardwine would have the child alone away from her or that he would have formal visitation. She stated that she had no problem with Boardwine "having some involvement" with the child and the child "eventually knowing" that Boardwine was the biological father. Her desire was to be the child's sole parent. They did not discuss Boardwine's role. Bruce never asked Boardwine for financial support. Bruce testified that Boardwine attended one of her sonogram visits but did not participate in her prenatal care.

Boardwine explained that he intended "to always be involved" with the child. According to Boardwine, the two agreed that Bruce would be the sole parent and that he would be able to see the child as little or as much as he wanted. He stated that he expected to be a part of the child's life, including attending the child's sporting activities and being involved in the child's educational and health decisions.

Bruce and Boardwine's relationship deteriorated around October 2010, when Bruce would not agree to Boardwine's suggested name for the child. After this argument, they did not speak until shortly after the child's birth, a period of about five months. Bruce did not inform Boardwine of the birth and did not list Boardwine on the birth certificate. Boardwine, however, learned about the birth and went to the hospital with friends and family. Bruce said that she never asked Boardwine for money or supplies and never asked him to visit or to care for the child. After she returned home from the hospital, Boardwine would come over to her home to visit. She characterized the visits as "[s]ort of strained." Boardwine was never alone with the child. Eventually, Bruce told Boardwine to "[s]top coming by."

III. THE LEGAL PROCEEDINGS BELOW

Boardwine initiated proceedings in the Roanoke City Juvenile and Domestic Relations District Court to establish his rights regarding the child, whom we will refer to as J.E. The court ordered the appointment of a guardian *ad litem* for J.E. By consent of the parties, Boardwine's petitions were dismissed or withdrawn and, then, appealed to the circuit court. Boardwine sought a finding of his paternity over J.E. as well as joint custody and visitation. Bruce filed a plea in bar and motion to dismiss, arguing, among other things, that Boardwine was merely a sperm donor and had no legal rights to the child. The court ordered a DNA test, which established Boardwine as J.E.'s father. Bruce does not contest that Boardwine is the child's biological father.

Following a hearing, the court denied Bruce's plea in bar and motion to dismiss and granted Boardwine's petitions. In a detailed memorandum opinion, the court made a number of alternative findings. As relevant here, the court held that the assisted conception statute, Code § 20-156 *et seq.*, did not apply because Bruce's "pregnancy did not result from 'artificial insemination' or any other 'intervening medical technology.'" The court also found, as a factual matter, that, when Boardwine provided his sperm, the parties intended for him to be J.E.'s legal father. Applying the factors listed in Code § 20-124.3, the court held that it was in J.E.'s best interests to award Boardwine joint legal and physical custody of J.E. as well as visitation.

ANALYSIS

This case presents questions of statutory construction. We review such questions *de novo* on appeal. L.F. v. Breit, 285 Va. 163, 176, 736 S.E.2d 711, 718 (2013).

- 4 -

I. THE ASSISTED CONCEPTION STATUTE DOES NOT APPLY.

The General Assembly patterned Virginia's assisted conception statute, Code § 20-156 *et seq.*, after the Uniform Status of Children of Assisted Conception Act.[1] The statute defines the child's father as "[t]he husband of the gestational mother of [the] child." Code § 20-158(A)(2). In contrast, a "donor is not the parent of a child conceived through assisted conception, unless the donor is the husband of the gestational mother." Code § 20-158(A)(3). In L.F. v. Breit, the Supreme Court explained that the origin and purpose of the assisted conception statute is to protect the interests of married parents by ensuring that "a married couple could obtain sperm from an outside donor without fear that the donor would claim parental rights." 285 Va. at 175, 736 S.E.2d at 717. If Boardwine is a "donor" under this statute, then he is not J.E.'s "parent," and he would have no statutory right to custody or visitation.

The statute defines a "donor" as "an individual, other than a surrogate, who contributes the sperm or egg used in assisted conception." Code § 20-156. In turn, Code § 20-156 defines "assisted conception" as

> a pregnancy resulting from any intervening medical technology, whether in vivo or in vitro, which completely or partially replaces sexual intercourse as the means of conception. Such intervening medical technology includes, but is not limited to, conventional medical and surgical treatment as well as noncoital reproductive technology such as artificial insemination by donor, cryopreservation of gametes and embryos, in vitro fertilization, uterine embryo lavage, embryo transfer, gamete intrafallopian tube transfer, and low tubal ovum transfer.

---

[1] The Uniform Status of Children of Assisted Conception Act was drafted by the National Conference of Commissioners of Uniform State Laws, also known as the Uniform Law Commission. This organization is a non-profit, unincorporated association consisting of commissioners appointed by each state, the District of Columbia, the Commonwealth of Puerto Rico, and the United States Virgin Islands. Its purpose is to discuss and debate which areas of the law require uniformity among the states and territories and to draft model legislation in those areas.

The phrase "medical technology" is noteworthy because it does not appear in the Uniform Status of Children of Assisted Conception Act.[2]

Bruce argues that, under a plain meaning of the assisted conception statute, Boardwine is nothing more than a sperm donor and, therefore, he "is not the legal father of the child born of that conception." Bruce argues that her method of becoming pregnant falls within the statute's provision for assisted conception through "noncoital reproductive technology" and, specifically, "artificial insemination by donor."

We construe statutes to "'ascertain and give effect to the intention of the legislature.'" Rutter v. Oakwood Living Ctrs. of Va., Inc., 282 Va. 4, 9, 710 S.E.2d 460, 462 (2011) (quoting Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc., 271 Va. 304, 309, 626 S.E.2d 436, 438 (2006)). Ordinarily, "this only requires applying the plain meaning of the words used in the statute because the General Assembly's intent 'is usually self-evident from the statutory language.'" Sheppard v. Junes, 287 Va. 397, 403, 756 S.E.2d 409, 411 (2014) (quoting Rutter, 282 Va. at 9, 710 S.E.2d at 462).

The statute's plain language does not support Bruce's interpretation. The word "medical," in its ordinary use, means "of, relating to, or concerned with physicians or with the practice of medicine" and "requiring or devoted to medical treatment." Webster's Third New International Dictionary 1402 (unabr. 1981). The statute does not encompass all technology.

---

[2] The Uniform Status of Children of Assisted Conception Act defined "assisted conception" as

> a pregnancy resulting from (i) fertilizing an egg of a woman with sperm of a man by means other than sexual intercourse or (ii) implanting an embryo, but the term does not include the pregnancy of a wife resulting from fertilizing her egg with sperm of her husband.

Unif. Status of Children of Assisted Conception Act § 1(1) (definitions) (Nat'l Conf. of Comm'rs of Unif. State Laws 1988).

Instead, its language is limited to "medical technology." The plain meaning of the term "medical technology" does not encompass a kitchen implement such as a turkey baster.

The examples listed in Code § 20-156 shed further light on the General Assembly's intent in crafting this statute. "Such intervening medical technology," under the statute,

> includes, but is not limited to, conventional medical and surgical treatment as well as noncoital reproductive technology such as artificial insemination by donor, cryopreservation of gametes and embryos, in vitro fertilization, uterine embryo lavage, embryo transfer, gamete intrafallopian tube transfer, and low tubal ovum transfer.

Code § 20-156. The meaning of words in a statute "may be determined by reference to their association with related words and phrases." Andrews v. Ring, 266 Va. 311, 319, 585 S.E.2d 780, 784 (2003). "When general words and specific words are grouped together, the general words are limited and qualified by the specific words and will be construed to embrace only objects similar in nature to those objects identified by the specific words." Id. Bruce did not become pregnant through "conventional medical and surgical treatment." Furthermore, the examples of "noncoital reproductive technology" listed in Code § 20-156 involve procedures performed with the assistance of medical personnel. An ordinary kitchen implement used at home is simply not analogous to the medical technologies that are listed in Code § 20-156, nor does it constitute a "reproductive" technology under the plain meaning of the term.

Relying on the plain language of Code § 20-156, we conclude that the assisted conception statute does not apply to Boardwine.

## II. BRUCE ESTABLISHED THAT HE IS J.E.'S FATHER UNDER CODE § 20-49.1.

There is no serious dispute that Boardwine established that he is the biological father of J.E. Boardwine relied on Code § 20-49.1(B)(1), which provides that "[t]he parent and child relationship between a child and a man may be established by . . . [s]cientifically reliable genetic tests, including blood tests, which affirm at least a ninety-eight percent probability of paternity."

- 7 -

Boardwine's test established his paternity by a probability greater than 99.999%. The path to fatherhood may have been unconventional, but as the father of J.E., Boardwine was entitled to seek (and as the trial court found, receive), visitation with his son.[3]

CONCLUSION

We affirm the judgment of the trial court.

Affirmed.

---

[3] Based on our resolution of the case, we need not reach Bruce's additional arguments.